IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

(Southern Division)

| | |
|---|---|
| CAUSAM ENTERPRISES, INC.,<br>8480 Honeycutt Road<br>Suite 200<br>Raleigh, NC 27615<br><br>          Plaintiff,<br><br>vs.<br><br>BALTIMORE GAS AND<br>ELECTRIC COMPANY,<br>2 Center Plaza<br>110 W. Fayette Street<br>Baltimore, MD 21201<br>        SERVE:<br>        Corporate Creations<br>        Network Inc. 2405 York<br>        Road<br>        Suite 201-C<br>        Lutherville-Timonium<br>        Maryland 21093<br><br>          Defendant. | Case No.:<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff, Causam Enterprises, Inc., by and through its attorneys, for its Complaint against Baltimore Gas and Electric Company, alleges as follows:

## INTRODUCTION

1.      This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 271, *et seq.*, to enjoin and obtain damages resulting from Defendant's unauthorized making and use in the United States of systems for implementing residential and small business commercial demand response programs and systems that infringe Plaintiff's United States patents, as described herein.

2.      Plaintiff seeks past and future damages and prejudgment and post-judgment interest for Defendant's infringement of U.S. Patent Nos. 12,386,375; 12,124,285; 11,262,779; 11,703,903; 10,116,134; and 10,768,654 (collectively, the "Asserted Patents").

## PARTIES

3.      Plaintiff, Causam Enterprises, Inc. ("Causam"), is a Delaware corporation with its principal place of business at 8480 Honeycutt Road, Suite 200, Raleigh, NC 27615. Causam is in the business of developing systems and related resources for the management, distribution, and consumption of electric power supply by the application and use of advanced, innovative technologies. Causam's innovations have been awarded more than 100 patents which cover multiple related technologies, including: demand response command and control; distributed generation; secure grid messaging; control and dispatch; aggregation of behind-the-meter resources; and the financial measurement, verification, and settlement of energy transactions. Causam's stated goal is to research, develop, innovate, and create resources for the efficient and effective management of the evolving electric power grid.

4.      Causam is the exclusive owner of all rights, title, and interest in and to the Asserted Patents, pursuant to the recorded assignment of those patents by the inventors and previous

2

assignees. Causam has the right to bring this suit to recover damages for any current or past infringement of the Asserted Patents.

5. Defendant Baltimore Gas and Electric Company ("BG&E") is a Maryland corporation with its headquarters and principal place of business in this District at 110 W. Fayette St., Baltimore, MD 21201. BG&E is an electric utility serving approximately 1.2 million customers within its territory which includes the City of Baltimore and Maryland counties of Anne Arundel, Baltimore, Calvert, Carroll, Harford, Howard and Montgomery. BG&E is a wholly owned subsidiary of Exelon Corporation.

## JURISDICTION AND VENUE

6. Plaintiff incorporates by reference paragraphs 1- 5.

7. This action arises under the patent laws of the United States, Title 35 of the United States Code, in particular, 35 U.S.C. §§ 271, 281, 283, 284, and 285. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

8. BG&E does business in Maryland and offers its products and/or services, including residential and small business commercial demand response programs implemented with the Accused System (as defined below), to customers and potential customers located in Maryland, including in the Judicial District of Maryland.

9. This Court has personal jurisdiction over BG&E in this action because BG&E is incorporated in Maryland.

10. Defendant BG&E maintains a regular and established place of business in this district, including but not limited to 2 Center Plaza, 110 West Fayette Street, Baltimore, MD 21201.

11. Defendant has committed acts of infringement in this district, including but not limited to making and/or using the Accused System.

3

12.     Venue is proper in this district under 28 U.S.C. § 1400(b) because Defendant BG&E resides in this district and because Defendant has a regular and established place of business in this district and has committed acts of infringement in this district.

## BACKGROUND

13.     The Asserted Patents and the technology involved address solutions to the complex problem of maintaining stable, reliable, continuously functioning, and cost-effective electric power grids in an environment where electric power demand is rising at historically high rates, resulting in periods of extreme levels of peak consumption. For many years, such increasing peak demand has been recognized as a significant risk factor in the ability of utilities to maintain a stable, functioning and reliable electric power grid serving both residential and commercial customers.

14.     Demand for electrical energy varies significantly over time due to environmental and other factors. Historically, substantial fluctuations in demand have often occurred within short periods of time resulting in "blackout" or "brownout" grid failures during peak demand periods and leaving consumers in geographic areas without power. This inability to maintain grid stability was clearly unacceptable and required action to avoid these serious adverse effects.

15.      Modern lifestyles continue to increase the demand for, and required reliability of, electric power. Nearly every aspect of daily personal and business life is dependent on continuous access to communications, management systems, and interactions with medical, financial, sales, and transportation systems via computer networks and devices that rely upon electric power for continued access and operation. In addition, most business interactions and transactions are now conducted by means of network communications and information storage and access. Thus, our health systems, financial security, business operations, and even national security are all dependent upon a reliable, continuously-operating electric power grid. And this historically high demand has

led to historically high energy prices.

16.    In many geographic locations, including Maryland, demand for reliable power is skyrocketing due to the proliferation of data centers and artificial intelligence, in combination with other factors such as the retirement of traditional generation, for example coal-fired facilities retired due to age and environmental concerns. For example, the PJM Interconnection, the regional transmission organization (RTO) that coordinates the movement of wholesale electricity in all or parts of 13 states, including all of Maryland, Delaware and the District of Columbia, is under increasing strain to meet this unprecedented demand caused by data centers and other growing areas of consumption. PJM estimates that this current and future increased demand will cause the cost of electricity to consumers to skyrocket by well over $100 billion through 2033 and will create "unacceptable" risks to grid reliability.[1]

17.    The responsibility for addressing the reliability and operation of electric grids resides in several regulatory agencies at both the state and federal level, including the Federal Energy Regulatory Commission (FERC) and North American Electric Reliability Corporation (NERC) at the federal level, and the more regionally applicable Independent System Operators (ISOs). PJM is one such ISO and is responsible for the interconnected grid covering several states, including Maryland. Each state also has its own public service commission which, under state laws, promulgate regulatory requirements for the operation of electricity distribution within the respective state's boundaries.

18.    Recognizing the significant risks involved in grid failures, these regulatory entities have issued and enforced certain requirements with which public utilities that distribute electric

---

[1] https://www.nrdc.org/press-releases/pjm-board-announces-final-proposal-address-data-center-demand. *See also* https://www.pjm.com/about-pjm.

power must comply. The principal conceptual requirement is that public utilities must maintain sufficient "reserves" of electric power to meet and exceed demand at peak periods. This requires each public utility to determine the maximum demand that may occur within its distribution system—such as on the hottest days of the year when HVAC usage is at its highest—and provide proof to regulators that they have sufficient electric power available in reserve to meet such high levels of demand when called upon. Compliance with these standards is mandatory.

19.    Traditional methods of meeting these reserve requirements have included: stand-by coal, oil or natural gas-fired generation facilities, which have significant maintenance and start-up costs; and firm contracts for additional high-priced stand-by reserve supplies of supplemental power from producers inside or outside of the ISO that can be introduced on demand. Both methods of securing proven additional power supply represent high-cost stand-by reserves which far exceed normal electric energy prices. In addition, new generation facilities are generally cost prohibitive and there is a lack of the consumer interest and political will necessary to support building the most efficient plants, such as nuclear facilities.

20.    A recognized alternative to additional, expensive supplies of reserve energy is the use of "curtailment" or reduction in consumption as a method of "peak shaving."  By reducing consumption, the need for additional power in critical peak periods can be reduced significantly. Curtailment can avoid the need to fire up additional generation facilities, acquire expensive power from other sources or construct new generation facilities, in whole or in part. Some utilities historically have attempted to address and implement curtailment as an alternative to supply increases through programs referred to as "demand response"—so-called because at times of peak "demand" utilities would call upon a limited number of large consumers of electric power, such as industrial customers like factories, to voluntarily reduce their consumption in "response" to the

peak event. Because these programs were voluntary, the amount of actual curtailment was not within the control of the utility, and therefore, was unpredictable, uncertain, and unreliable. These programs were generally limited to a small number of large-scale industrial customers using episodic communications and without predetermined and measurable reductions in consumption.

21.    As a result, these early programs were insufficient to be considered as "reserves" that could be predictably called upon to satisfy peak demand and were not a viable means of supporting grid stability. The utilities attempting to implement these voluntary programs simply had no command or control ability to deploy reductions in consumption and had little or no means to measure them and verify their results prior to or even during a peak demand event. In short, neither the utilities nor the regulators could depend upon these programs to satisfy mandatory reserve requirements.

## THE INVENTOR AND INVENTIONS

22.    In or about 2003 the inventor of the Asserted Patents, Mr. Joseph Forbes, relying upon his extensive experience in the development and implementation of cell phone networks and systems obtained from his prior work experience at Bell South and construction and operations of digital wireless communications networks with his own engineering firms, foresaw the need for demand response systems that could provide the requisite predictable, measurable, verifiable, and callable curtailment of energy consumption for peak shaving on a broad-scale residential and small business commercial basis. Mr. Forbes developed innovative, specific, patentable systems and methods for addressing and overcoming these complex technological problems in the implementation of these demand response ("DR") systems.

23.    The overall concept was to change the DR curtailment paradigm from the voluntary, uncontrollable participation by just a few large consumers to the utility-controlled reduction of consumption by tens or hundreds of thousands of power-consuming devices owned

and used by residential and small business customers across the grid. Such a conversion posed very significant problems requiring innovative technological solutions.

24.     Systems were needed to place the control of an enormously large number of power-consuming devices in the hands of the utilities, and to curtail demand in sufficient predetermined blocks of kilowatt hours to satisfy regulatory requirements. These systems would also need to capture – through real-time or near-real time communication, confirmation of participation in event, aggregation, measurement, and/or verification – the data needed to quantify the "reserves" available before any peak demand event; to ensure that the reductions in energy consumption would occur when needed and called upon to deliver; and to enable the participants—utilities as well as consumers—to be properly managed and compensated.

25.     This was a complex problem to solve. While the concept of addressing peak demand by curtailment was known, how to structure, create, deploy, manage, and operate a system for widespread and effective residential/small business demand/response based "reserves" was not. Such a system necessarily involved several issues:  the networking of tens if not hundreds of thousands of power-consuming devices within homes and small businesses across a substantial geographic portion of the electric grid; the ability to control the power consumption of those devices as a group, individually, sequentially, centrally and in real time and in coordination with high demand events; the enlistment and participation of consumers and their power consuming devices; the installation, registration and profiling of load control devices such as smart thermostats and load switches; and the ability to accurately and efficiently obtain, through measurement and calculation, the monetary equivalents, generally a curtailment value as a supply, that would be accepted by governing entities.

26.     Such a system also would require the ability to identify and measure, in advance,

the amount of power consumption that could be aggregated and verified from across this portfolio of controlled power-consuming devices to ensure that an operating reserve of power actually existed and would be available when called upon for peak shaving. And to ensure that the power consumption was reduced as required, the system would require taking actual measurements of the reduction in power and not relying on estimates based on historical usage. Achieving these goals would necessarily require the creation and deployment of a complex and innovative technological system, non-existent at the time, to include physical devices and components; communication, command and control components; data acquisition, aggregation and measurement and verification in combination and management of customer profile data that, in general, was previously not maintained by utilities.

27.    Inventor Forbes envisioned embodiments of this system and created these patentable, technological solutions embodied in the claims of the Asserted Patents.

28.    Mr. Forbes's extensive patent specifications, filed with the U.S. Patent and Trademark Office beginning in 2007 and thereafter, specifically address the state of the art that existed at the time, the substantial problem that required the inventions of the Asserted Patents to overcome, and the specific inventions claimed.

29.    These inventions have resulted in an extensive patent portfolio covering multiple aspects of electric power demand, supply, and grid management, including the patents asserted here.

<strong><u>THE REGULATORS, REGULATIONS AND DR PROGRAMS</u></strong>

30.    Since at least 2011, certain regulatory authorities began recognizing and attempting to address peak demand power needs by curtailment, and began developing basic requirements, processes, and procedures to expand and incentivize residential and small business demand response programs as a viable, additional method of creating "reserves" for grid stability.

9

31.    FERC issued Order No. 745, titled *Demand Response Compensation in Organized Wholesale Energy Markets*, on March 15, 2011. The order established a uniform compensation framework requiring organized wholesale markets (RTOs/ISOs) to pay demand response created reserves the locational marginal price (LMP) – the same price paid for supply – as a direct incentive to utilities. The purpose is to compensate demand response resources at the same rates as generation resources when they are cost-effective.

32.    The North American Electric Reliability Corporation ("NERC") also recognized the need for and has developed standards and procedures for obtaining and aggregating data for use with dispatched demand response reserves. NERC is an independent, non-profit regulatory authority focused on ensuring the security and reliability of the bulk power system (the electrical grid) in North America. It sets and enforces mandatory standards for grid operators. NERC was organized and given legally binding authority after the 2003 Northeast Blackout and is overseen by FERC.

33.    PJM is the largest Regional Transmission Organization (RTO) in the U.S. PJM manages the high-voltage electric system that provides power to 67 million people and serves all or parts of Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, West Virginia and the District of Columbia. PJM administers a competitive wholesale electricity market for the purpose, among other things, of identifying and advancing the implementation of cost-efficient improvements to the grid to ensure reliability and economic benefits, including demand response programs. PJM is regulated by FERC.

34.    The activities of Defendant are also subject to the regulatory authority of the Maryland Public Service Commission (MPSC), which is an independent state regulatory agency

that oversees public utilities in Maryland. It regulates electricity, natural gas, telecommunications, water, and certain transportation services to ensure safe, reliable, and reasonably-priced utility service for consumers. Regarding electricity, the MPSC regulates investor-owned utilities and certain competitive energy suppliers, establishing rates and service standards. Its authority extends to reviewing rate change proposals, approving infrastructure investments, and adjudicating consumer complaints.

35.    The MPSC operates under Division 1, Title 7 of the Public Utilities Article of the Maryland Annotated Code and regulates DR programs through this statutory authority. Under the EmPOWER Maryland Energy Efficiency Act (Public Utilities § 7-211), the MPSC requires each electric utility to file energy efficiency and DR plans to meet mandatory energy savings targets for the purpose of achieving peak demand reduction goals.

36.    The DR programs in Maryland are utility-administered under the EmPOWER Maryland Program ("EmPOWER"). These programs include direct load control DR programs in which utilities can cycle or control customer equipment (e.g., air conditioners, water heaters) and which are typically deployed during peak summer demand events. The MPSC does not directly run these programs but regulates utility participation and customer protections. The MPSC uses DR to achieve peak demand reduction, avoid expensive back-up generation capacity, lower system costs, and maintain grid reliability.

37.    The MPSC approves and encourages consumers to participate in BG&E's *Energy Wise Rewards* and *Flex Rewards* DR programs, which BG&E provides to customers in both Maryland and Delaware.

38.    Defendant is an electric utility who has deployed and is operating MPSC-approved DR programs within its service area. BG&E's programs are branded as *Connected Rewards* and

*Peak Rewards*.

39.     Each of these FERC-compliant and MPSC-approved DR programs is deployed and operated by Defendant using Accused Systems that infringe the Asserted Patents.

**THE ACCUSED SYSTEM**

40.     To implement and operate its MPSC-approved load control DR programs branded as *Connected Rewards* and *Peak Rewards* for residential and small business commercial customers, BG&E made, makes, used and uses a system that infringes the Asserted Patents ("Accused System"). The Accused System provides BG&E with network communications and control of thousands of power consuming devices within homes and small businesses across its grid, and includes the functionalities of: reducing the power consumption of those devices individually and in real time, in coordination with high demand events; utilizing load control devices such as smart thermostats and load switches installed and registered with consumers to control them; identifying and measuring the amount of power consumption that could be reduced, aggregated, measured and verified from across this portfolio of controlled power-consuming devices; and creating an available operating reserve that can be called upon for peak demand shaving and compensated under regulatory requirements.

41.     Included among the functional components of the Accused System is the use of a Distributed Energy Resources Management System (DERMS) platform. BG&E incorporates and/or has incorporated into its Accused System the EnergyHub DERMS platform ("EnergyHub Platform") and the Resideo Connected Savings DERMS platform ("Resideo Platform").

42.     As of approximately December 2025, both the EnergyHub and Resideo Platforms

12

are owned by EnergyHub.[2]  As detailed in the attached claim charts, these two platforms perform many of the same functions that are recited in the claims of the Asserted Patents.

43.     On information and belief, EnergyHub has moved and/or plans to move all Resideo Platform users to the EnergyHub Platform. For example, EnergyHub announced that "[t]he acquisition [of Resideo] reflects a growing industry shift toward using a *single integrated* edge distributed energy resource management system (DERMS) platform to manage all distributed energy resources (DERs) as utilities expand Virtual Power Plants (VPPs) to include EVs, batteries, and other DERs."   https://www.energyhub.com/news/energyhub-acquires-resideo-grid-services (emphasis added). In addition, the EnergyHub customer agreements now expressly apply to both the Resideo Platform and EnergyHub[3] and describe the platforms as having the same functionality. And as of approximately April or May of 2026, the Resideo Connected Savings websites are no longer available.[4]

44.     BG&E has used, uses and will continue to use the Resideo Platform and/or EnergyHub Platform to manage its DR program. Using these platforms, BG&E servers send messages to smart thermostats and/or other load control switch devices in their service area during a DR event. For example, the message may instruct the smart thermostats to increase the set point, thereby turning off the associated HVAC unit until the high set point is reached or instruct the load control switch to turn off an HVAC compressor unit for a period of time. The Defendant has also used and continues to use these platforms to obtain information from smart thermostats, such as

---

[2] https://investor.resideo.com/news/news-details/2025/Resideo-Announces-Sale-of-Grid-Services-Demand-Response-Business-to-EnergyHub/default.aspx.

[3] *See* https://www.energyhub.com/terms (explaining it applicability to both "the EnergyHub Platform (formerly the Mercury Platform) . . . and the Connected Savings Platform").

[4] *Compare* www.connectedsavings.com *with*

https://web.archive.org/web/20260307123908/https://www.connectedsavings.com/.

usage information, to obtain and retain customer profiles and preferences, and to obtain load data from meters to measure the energy saved at each location and each load consuming device during the DR event. The Defendant's servers prepare this data and provide it, as required by regulatory authorities, to settle on and collect payment for implementation of DR reserves.

45.    Defendant's DR program may require customers to provide their own smart thermostats, referred to as Bring Your Own Device or "BYOD" programs, or the utility may provide smart thermostats to customers, or both. Instead of or in addition to smart thermostats, the Accused System may include and/or use load control switches, and instead of or in addition to HVAC units the Accused System may include and/or use additional controllable load consuming devices such as heat pumps, pool pumps and/or water heaters.

46.    As described above, regulators including FERC and PJM impose various conditions and requirements for a demand response resource to participate in PJM's wholesale electricity markets. Defendant has participated and continues to participate in the PJM wholesale electricity markets,[5] and, therefore, the Accused System complies with such regulatory conditions and requirements.

**PATENTS-IN-SUIT**

47.    The inventions claimed in the Asserted Patents are system claims that include multiple components (hardware, software, communications, etc.) that work together in an ordered combination to perform the innovative functionality that is required to successfully deploy, install, operate and manage a load control DR system that supports grid stability by delivering predictable, available electric power reserves to the grid when called to do so at times of peak demand. And to

---

[5] https://psc.maryland.gov/wp-content/uploads/2025-EmPOWER-Maryland-Energy-Efficiency-Act-Standard-Report-Final.pdf.

14

do so in compliance with, and in satisfaction of, the regulatory requirements for verification and compensation and method claims related to such systems.

48.     The technical terms and acronyms used in the specifications and claims are well-defined in communications, computer hardware, software, networking, electric power device, and electric grid management industries, and are well understood by a person of ordinary skill in these arts. Complete descriptions of these terms and related acronyms can be found in readily available standards and literature.

### U.S. Patent No. 12,386,375

49.     United States Patent No. 12,386,375 ("the '375 Patent"), entitled "Method and Apparatus for Actively Managing Electric Power Over an Electric Power Grid" was duly issued on August 12, 2025. A true and correct copy of the '375 Patent is attached as **Exhibit 1**.

50.     Causam is the owner of the entire right, title, and interest in and to the '375 Patent by virtue of valid and binding assignments by the inventors of all rights and titles in and to the Patent. Causam has the right and standing to bring suit for infringement and to recover for past, present, and future infringement.

51.     The '375 Patent claims, among other things:

> 8. A system for managing an electric power grid, comprising:
>
>     at least one server, including a processor and a memory, wherein the at least one server receives a power control command requiring a reduction of an amount of power consumed by at least one power consuming device;
>
>     at least one client device in network communication with the at least one server;
>
>     wherein the at least one server issues a power control message to the at least one client device in response to the power control command;
>
>     wherein the power control message causes the at least one client device to adjust a setting of the at least one power consuming device, and wherein the adjustment of the setting of the at least one power consuming device results in a reduction of power consumed by the at least one power consuming device;

wherein the at least one server or the at least one client device generates a value relating to a reduction in consumed power based on duty cycles and/or set points for the at least one power consuming device participating in at least one load control event;

wherein the duty cycles and/or the set points of the at least one power consuming device is determined at the at least one client device or at the at least one server; and

wherein the at least one server generates a total energy savings for one of the at least one load control event based on the value relating to the reduction in consumed power for each of the at least one power consuming device.

### U.S. Patent No. 12,124,285

52. United States Patent No. 12,124,285 ("the '285 Patent"), entitled "System and Methods for Actively Managing Electric Power Over an Electric Power Grid," was duly issued on October 22, 2024. A true and correct copy of the '285 Patent is attached as **Exhibit 2**.

53. Causam is the owner of the entire right, title, and interest in and to the '285 Patent by virtue of valid and binding assignments by the inventors of all rights and titles in and to the Patent. Causam has the right and standing to bring suit for infringement and recover for past, present, and future infringement.

54. The '285 Patent claims, among other things:

8. A system for managing power on an electric power grid, comprising:

at least one active load client constructed and configured for communication with a server and at least one power consuming device;

at least one meter configured to measure power consumption by the at least one power consuming device;

wherein the at least one active load client receives a power control message from the server, wherein the power control message includes a curtailment request for the at least one power consuming device;

wherein the at least one active load client receives at least one request message from the server, including preference information for the at least one power consuming device;

wherein based on the preference information, the at least one active load client transmits at least one power reduction command to the at least

one power consuming device;

wherein the at least one power reduction command causes the at least one power consuming device to turn off in near real time;

wherein the at least one meter generates an actual value corresponding to a reduction in power consumed by the at least one power consuming device;

wherein the actual value is generated based on government approved methods of calculation established under Federal Energy Regulatory Commission (FERC) Order 745 or an independent system operator (ISO) for the at least one power consuming device;

wherein the at least one meter communicates the actual value with the server via an advanced metering infrastructure;

wherein the server aggregates the actual value for each of the at least one power consuming device into at least one Power Trade Block (PTB) unit able to be sold on an energy settlement marketplace; and

wherein the at least one active load client transmits at least one update message to the server, wherein the at least one update message includes information regarding a status of the at least one power consuming device;

wherein the actual value is utilized as contingency reserves for a power utility and/or grid operator;

wherein the server receives a request for amounts of one or more specific types of operating reserves; and

wherein the server is operable to determine when and to which of the at least one power consuming devices to send the at least one power reduction command based on the requested amounts of one or more specific types of operating reserves.

### U.S. Patent No. 11,262,779

55.    United States Patent No. 11,262,779 ("the '779 Patent"), entitled "Method and Apparatus for Actively Managing Electric Power Over an Electric Power Grid," was duly issued on March 1, 2022. A true and correct copy of the '779 Patent is attached as **Exhibit 3**.

56.    Causam is the owner of the entire right, title, and interest in and to the '779 Patent by virtue of valid and binding assignments by the inventors of all rights and titles in and to the Patent. Causam has the right and standing to bring suit for infringement and recover for past, present, and future infringement.

17

57.    The '779 Patent claims, among other things:

1. A system for managing an electric power grid, comprising:

a server, including a processor and a memory, wherein the server receives a power control command requiring a reduction of an amount of power consumed by at least one power consuming device;

wherein the server determines an amount of power available for the at least one power consuming device based on a baseline historical load for the at least one power consuming device, an estimation based on a load profile of the at least one power consuming device, and/or real-time or near real-time measurement of the power consumption of the at least one power consuming device;

wherein the server issues a power control message in response to the power control command;

wherein the power control message causes a reduction of a flow of power to the at least one power consuming device based on the amount of power available for the at least one power consuming device;

wherein the amount of the flow of power reduced to the at least one power consuming device is confirmed by measurement and verification; and

wherein the measurement and verification is transmitted to the server.

**U.S. Patent No. 11,703,903**

58.    United States Patent No. 11,703,903 ("the '903 Patent"), entitled "Method and Apparatus for Actively Managing Electric Power Over an Electric Power Grid," was duly issued on July 18, 2023. A true and correct copy of the '903 Patent is attached as **Exhibit 4**.

59.    Causam is the owner of the entire right, title, and interest in and to the '903 Patent by virtue of valid and binding assignments by the inventors of all rights and titles in and to the Patent. Causam has the right and standing to bring suit for infringement and recover for past, present, and future infringement.

60.    The '903 Patent claims, among other things:

15. A system for managing an electric power grid, comprising:

a server, including a processor and a memory, wherein the server receives a power control command requiring a reduction of an amount of

18

power consumed by at least one power consuming device;

at least one client device in network communication with the server;

wherein the server issues a power control message to the at least one client device in response to the power control command;

wherein, based on the power control message, the at least one client device causes a reduction of a flow of power to the at least one power consuming device;

wherein the server or the at least one client device generates a power supply value (PSV) for the at least one power consuming device;

wherein the PSV is an actual value including a reduction in consumed power based on measured participation of the at least one power consuming device in at least one load control event; and

wherein the at least one client device transmits an acknowledgement for participation of the at least one power consuming device in the at least one load control event in real time or near real time.

**U.S. Patent No. 10,116,134**

61.    United States Patent No. 10,116,134 ("the '134 Patent"), entitled "Systems and Methods for Determining and Utilizing Customer Energy Profiles for Load Control for Individual Structures, Devices, and Aggregation of Same," was duly issued on October 30, 2018. A true and correct copy of the '134 Patent is attached as **Exhibit 5**.

62.    Causam is the owner of the entire right, title, and interest in and to the '134 Patent by virtue of valid and binding assignments by the inventors of all rights and titles in and to the Patent. Causam has the right and standing to bring suit for infringement and recover for past, present, and future infringement.

63.    The '134 Patent claims, among other things:

19. A system for determining and using customer energy profiles to manage electrical load control events on a communications network between a server in communication with an electric grid operator or any market participant associated with an electric power grid and a plurality of customers at a plurality of service points, comprising:

a memory storing a database containing a plurality of customer profiles for load control events wherein each customer profile includes at

least energy consumption information for a plurality of controllable temperature control devices at the plurality of service points;

a server processor, cooperative with the memory, and configured for managing the load control events on the communications network to the plurality of service points by:

generating a plurality of customer profiles for the plurality of customers;

aggregating the plurality of customer profiles into at least one aggregate customer profile based on at least one predetermined criterion;

generating a candidate list of service points for load control events based on the at least one predetermined criterion;

sending a load control event to at least one service point selected from the candidate list of service points in response to an energy reduction request including a target energy savings received from the electric grid operator or any market participant associated with the electric power grid via the communications network;

determining an energy savings for the plurality of controllable temperature control devices resulting from the load control event at the at least one service point, wherein the energy savings is determined based on a monetary supply equivalent value for each of the plurality of controllable temperature control devices, wherein each monetary supply equivalent value is a measurement and a verification of the reduction in consumed power corresponding to each of the plurality of controllable temperature control devices, wherein the monetary supply equivalent value is a curtailment value as a supply accepted by governing entities for awarding the plurality of customers;

determining the resulting energy savings is at least equal to the target energy savings.

### U.S. Patent No. 10,768,654

64.    United States Patent No. 10,768,654 ("the '654 Patent"), entitled "Method and Apparatus for Actively Managing Electric Power Supply for an Electric Power Grid," was duly issued on September 8, 2020. A true and correct copy of the '654 Patent is attached as **Exhibit 6**.

65.    Causam is the owner of the entire right, title, and interest in and to the '654 Patent by virtue of valid and binding assignments by the inventors of all rights and titles in and to the Patent. Causam has the right and standing to bring suit for infringement and recover for past,

20

present, and future infringement.

66.     The '654 Patent claims, among other things:

8. A system for managing power on an electric power grid, comprising:

a server constructed and configured for network communication with at least one power consuming device in the electric power grid, wherein the server comprises a database;

wherein the server is operable to issue a power control event message responsive to a power control command, wherein the power control command comprises a power inquiry command requesting the server to determine an amount of power available for temporary reduction or increase from supply;

wherein the database is operable to store information comprising power consumed by the at least one power consuming device and power to be reduced to the at least one power consuming device;

wherein the server is operable to generate a supply equivalence value for each of the at least one power consuming device based on an actual value of power to be reduced to each of the at least one power consuming device, wherein each supply equivalence value is a monetary supply equivalence value based on measurement and verification, and wherein each supply equivalence value provides for a curtailment value as a supply to the electric power grid; and

wherein the server is operable to disable a power flow to the at least one power consuming device based on the supply equivalence value for each of the at least one power consuming device.

**COUNT ONE: INFRINGEMENT OF THE '375 PATENT**

67.     Causam repeats and realleges paragraphs 1 through 66 as if fully set forth herein.

68.     Defendant has been and is infringing, literally and/or under the doctrine of equivalents, at least claims 8, 10, 11, 15, 17, 18, 19 and 20 of the '375 Patent in violation of 35 U.S.C. § 271(a) by, for example, making and using the Accused System within this district and elsewhere in the United States, without license or authority. A chart showing infringement of illustrative claims by an Accused System is attached as **Exhibit 7**.

69.     Defendant's acts of infringement of the '375 Patent have caused and will continue to cause Plaintiff damages for which Plaintiff is entitled to compensation pursuant to 35 U.S.C.

§ 284.

70.     Causam has complied with any duties or obligations under 35 U.S.C. § 287 regarding the '375 Patent.

**COUNT TWO: INFRINGEMENT OF THE '285 PATENT**

71.     Causam repeats and realleges paragraphs 1 through 70 as if fully set forth herein.

72.     Defendant has been and is infringing, literally and/or under the doctrine of equivalents, at least claims 8, 9, 12, 13, 16, 17, 18, and 19 of the '285 Patent in violation of 35 U.S.C. § 271(a) by, for example, making and using the Accused System within this district and elsewhere in the United States, without license or authority. A chart showing infringement of illustrative claims by an Accused System is attached as **Exhibit 8**.

73.     Defendant's acts of infringement of the '285 Patent have caused and will continue to cause Plaintiff damages for which Plaintiff is entitled to compensation pursuant to 35 U.S.C. § 284.

74.     Causam has complied with any duties or obligations under 35 U.S.C. § 287 regarding the '285 Patent.

**COUNT THREE:  INFRINGEMENT OF THE '779 PATENT**

75.     Causam repeats and realleges paragraphs 1 through 74 as if fully set forth herein.

76.     Defendant has been and is infringing, literally and/or under the doctrine of equivalents, at least claims 1, 3, 6, 9, 11 and 12 of the '779 Patent in violation of 35 U.S.C. § 271(a) by, for example, making and using the Accused System within this district and elsewhere in the United States, without license or authority. A chart showing infringement of illustrative claims by an Accused System is attached as **Exhibit 9**.

77.     Defendant's acts of infringement of the '779 Patent have caused and will continue to cause Plaintiff damages for which Plaintiff is entitled to compensation pursuant to 35 U.S.C.

§ 284.

78.    Causam has complied with any duties or obligations under 35 U.S.C. § 287 regarding the '779 Patent.

## COUNT FOUR: INFRINGEMENT OF THE '903 PATENT

79.    Causam repeats and realleges paragraphs 1 through 78 as if fully set forth herein.

80.    Defendant has been and is infringing, literally and/or under the doctrine of equivalents, at least claims 15, 16, 17, 18, 19, 20, 21 and 22 of the '903 Patent in violation of 35 U.S.C. § 271(a) by, for example, making and using the Accused System within this district and elsewhere in the United States, without license or authority. A chart showing infringement of illustrative claims by an Accused System is attached as **Exhibit 10**.

81.    Defendant's acts of infringement of the '903 Patent have caused and will continue to cause Plaintiff damages for which Plaintiff is entitled to compensation pursuant to 35 U.S.C. § 284.

82.    Causam has complied with any duties or obligations under 35 U.S.C. § 287 regarding the '903 Patent.

## COUNT FIVE: INFRINGEMENT OF THE '134 PATENT

83.    Causam repeats and realleges paragraphs 1 through 82 as if fully set forth herein.

84.    Defendant has been and is infringing, literally and/or under the doctrine of equivalents, at least claims 19, 20, 21, 22, 23, 24 and 25 of the '134 Patent in violation of 35 U.S.C. § 271(a) by, for example, making and using the Accused System within this district and elsewhere in the United States, without license or authority. A chart showing infringement of illustrative claims by an Accused System is attached as **Exhibit 11**.

85.    Defendant's acts of infringement of the '134 Patent have caused and will continue to cause Plaintiff damages for which Plaintiff is entitled to compensation pursuant to 35 U.S.C.

§ 284.

86.    Causam has complied with any duties or obligations under 35 U.S.C. § 287 regarding the '134 Patent.

## COUNT SIX:  INFRINGEMENT OF THE '654 PATENT

87.    Causam repeats and realleges paragraphs 1 through 86 as if fully set forth herein.

88.    Defendant has been and is infringing, literally and/or under the doctrine of equivalents, at least claims 1, 2, 3, 5, 7, 8, 9, 10, and 11 of the '654 Patent in violation of 35 U.S.C. § 271(a) by, for example, making and using the Accused System within this district and elsewhere in the United States, without license or authority. A chart showing infringement of illustrative claims by an Accused System is attached as **Exhibit 12**.

89.    Defendant's acts of infringement of the '654 Patent have caused and will continue to cause Plaintiff damages for which Plaintiff is entitled to compensation pursuant to 35 U.S.C. § 284.

90.    Causam has complied with any duties or obligations under 35 U.S.C. § 287 regarding the '654 Patent.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendant as follows:

A.  Adjudging that Defendant has infringed the Asserted Patents;

B.  Ordering Defendant to account for and pay reasonable royalty and other damages adequate to compensate Causam for the Defendant's infringement of the Asserted Patents, including pre-judgment and post-judgment interest and costs, pursuant to 35 U.S.C. § 284;

C.  Ordering an accounting for any infringing sales not presented at trial and an award by the court of additional damages for any such infringing sales;

24

D.  Awarding reasonable attorneys' fees and expenses against Defendant pursuant to 35 U.S.C. § 285; and

E.  Awarding such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues so triable by right.

May 26, 2026                         Respectfully submitted,


                          /s/ *Douglas M. Bregman*
                          Douglas M. Bregman  (No. 02131)
                          Geoffrey T. Hervey    (No. 04243)
                          John. R. Grimm         (No. 19223)

                          BREGMAN, BERBERT, SCHWARTZ
                              & GILDAY, LLC
                          7315 Wisconsin Avenue
                          Suite 800 West
                          Bethesda, MD  20814
                          dbregman@bregmanlaw.com
                          ghervey@bregmanlaw.com
                          jgrimm@bregmanlaw.com
                          (301) 656-2707 – Telephone
                          (301) 961-6525 – Facsimile


                          /s/ *Robert F. Ruyak*
                          Robert F. Ruyak (admission pending)
                          S. Gregory Herrman
                          (application for admission *Pro Hac Vice*
                          forthcoming)

                          LARSON LLP
                          900 17th Street NW, Suite 200
                          Washington, DC 20006
                          rruyak@larsonllp.com
                          sherrman@larsonllp.com

                          Telephone: (202)795-4900
                          Facsimile: (202)795-4888

                          *Attorneys for Plaintiff,*
                          *Causam Enterprises, Inc.*